JUDGE BUCHWALD

11 CIV 6705

**BECKER & POLIAKOFF LLP**
Helen Davis Chaitman, Esq.
Andrew Byrne, Esq.
Valerie Sirota, Esq.
45 Broadway, 8th Floor
New York, New York 10006
(212) 599-3322
*Attorneys for Plaintiff Adrian Lismore*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ADRIAN LISMORE,                                  :
                                                 :
                              Plaintiff,          :          **COMPLAINT**
                                                 :
                                                 :     Civil Action No. _____
        - against -                              :
                                                 :     JURY TRIAL DEMANDED
                                                 :
                                                 :
SOCIETE GENERALE ENERGY CORP.,                   :
                                                 :
                              Defendant.          :
-------------------------------------------------------X

RECEIVED
U.S.D.C. S.D.N.Y.
CASHIERS

    Plaintiff, Adrian Lismore, sues Defendant, Societe Generale Energy Corp. ("SG

Energy"), and alleges as follows:

## NATURE OF THE CASE

    This is an action for breach of an oral agreement pursuant to which Adrian

Lismore was induced by representatives of SG Energy to use his personal contacts and

expertise to facilitate the acquisition of the US assets and employees of the company

known as RBS Sempra Commodities Trading LLC, a joint venture between RBS (Royal

Bank of Scotland) and Sempra Utilities of California (RBS-Sempra US) in return for

being named head of the new business unit with and the payment of a multi-million

dollar bonus.  Mr. Lismore performed his part of the oral contract but SG Energy

{N0002525}

ultimately refused to perform its portion of the contract motivated by an anti-American bias. Once SG Energy realized the economic benefit of Mr. Lismore's efforts, they unilaterally and wrongfully terminated the agreement and denied Plaintiff the promised compensation and position. In so doing, SG Energy and its executives breached SG Energy's contract with Mr. Lismore, and violated Title VII of the Civil Rights Act of 1964.

## THE PARTIES

1.     Plaintiff is a citizen of the United States. He maintains his residence at 124 West 87th Street, New York, New York 10024.

2.     SG Energy is a Delaware corporation with its principal place of business at 1221 Avenue of the Americas, New York, New York 10020. It is a wholly-owned subsidiary of Societe Generale Energy, SA, a French corporation that is a wholly-owned subsidiary of Societe Generale.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over Plaintiff's claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*, pursuant to 28 U.S.C. § 1331, and has supplemental subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to Plaintiff's Title VII claim that they form part of the same case or controversy under Article III of the United States Constitution.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

5.      Plaintiff was first employed by Societe Generale in January 2004.
Between 2004 and 2011, Plaintiff held the following positions for Societe Generale:

a.      In 2004, Plaintiff was co-head of commodity derivative sales for the
Americas headquartered in New York.  He built the business' revenues from $10 - $15
million a year to $150 million a year.

b.      In 2005, Plaintiff was added to the Executive Committee of the commodities
business to represent the Americas and to look for acquisition and growth opportunities
in physical gas and power in the United States.

c.      In March 2007, Plaintiff was promoted to Deputy Global Head of
Commodity Sales based in New York and was asked to move to London in December
2008, where he became part of the Corporate and Institutional Commodity Sales Team
management for Asia, the Americas and Europe.

d.      In March 2009, Plaintiff was promoted to Global Head of Corporate
Commodity Sales based in London where he focused on building the corporate sales
teams globally.

e.      In 2010, Plaintiff was promoted to Co-Head of Energy under the title
Product Line Manager Energy based in Houston, Texas, with the specific role to build
the energy business globally, with a focus on the Americas.

6.      In furtherance of his promotion referenced in paragraph 5(e) above, by
letter dated August 6, 2010, Thornton Jenness, Managing Director of Human Resources
for Societe Generale, proposed a new contract with Mr. Lismore (the "2010 Employment
Agreement") offering him the position of Product Line Manager for Energy in the

Commodities Derivatives Department ("Product Line Manager").  A copy of the 2010 Employment Agreement is annexed hereto as Ex. A.  Plaintiff entered into this contract.

7.     The 2010 Employment Agreement provided that Plaintiff's position as Product Line Manager would commence on or about October 1, 2010 and would be based in Houston, Texas.

8.     The Employment Agreement outlined the terms of Plaintiff's employment "pursuant to this opportunity[,]" clearly referring to Plaintiff's position as Product Line Manager.

9.     On August 8, 2010, Plaintiff accepted the position of Product Line Manager, and executed the contract.

10.    Under the 2010 Employment Agreement, Plaintiff was entitled to deferred compensation that was outstanding in his account.  The deferred compensation reflected the share price of Societe Generale from years 2008 – 2010.  The approximate value of the outstanding amount is $1,100,000 to $1,200,000.  He will be seeking that amount in Arbitration against Societe Generale in a separate action, as well as pursuing other claims against Societe General in Arbitration pursuant to his employment agreement.

11.    However, before the effective date of the 2010 Employment Agreement, and at a time when Plaintiff was already performing the duties of his new position as Product Line Manager, Plaintiff became aware of an opportunity to acquire RBS Sempra US.  Societe Generale asked Plaintiff to use his personal contacts and expertise to lead the negotiations for the acquisition by Defendant SG Energy of RBS Sempra US, and thereafter become the head of the new business unit.  Plaintiff agreed to fulfill these tasks pursuant to an oral agreement with SG Energy (the "Oral Agreement").

12.     The Oral Agreement was not contemplated by the 2010 Employment Agreement and represented an entirely new agreement between Plaintiff and SG Energy. Therefore, Plaintiff's 2010 Employment Agreement was conclusively terminated once SG Energy and Plaintiff entered into the Oral Agreement.

13.     The Oral Agreement did not establish a fixed duration and therefore, the employment relationship was at will, terminable at any time by either party.

14.     In accordance with an in reliance on the Oral Agreement, beginning in September 2010, Plaintiff began effectuating the acquisition by SG Energy of RBS Sempra US.

15.     Throughout the negotiations for the acquisition of RBS Sempra US, Plaintiff was repeatedly assured by representatives of SG Energy that he would be the lead of the new entity, that his participation as a key officer of SG Energy was essential, and that SG Energy had no interest in acquiring RBS Sempra US unless he managed SG Energy.

16.     As the negotiations proceeded for SG Energy's purchase of RBS Sempra US, SG Energy's representatives continued to assure Plaintiff that he would the head of the new business unit, and numerous company announcements were made to that effect.

17.     As the negotiations drew to conclusion, and consistent with Plaintiff's oral contract with SG Energy, all of the RBS Sempra US employees and Societe Generale employees transferring to SG Energy were required to and did enter into contracts with SG Energy. In addition to facilitating Societe Generale's business standard business practices, it was also required by US banking laws, because Societe Generale did not have a banking license in Connecticut, where SG Energy was based at the time.

18.    Although Plaintiff had an oral contract with SG Energy, he was informed that Societe Generale's Human Resources department had drafted an employment agreement between SG Energy and Plaintiff detailing his role as President of SG Energy and otherwise memorializing the terms of his oral agreement with SG Energy.

19.    With respect to compensation, Neviaski and Gonzague Bataille, head of SG Energy, along with Societe Generale's Director of Human Resources for Commodities, Kevin Mepyans, represented to Plaintiff that a significant, multi-million dollar pool of monies would be set aside for the managers of SG Energy who achieved the acquisition of RBS Sempra US. He was specifically told that the March 2011 compensation paid to Plaintiff did not include compensation for his role in bringing about the acquisition of RBS Sempra US, as that would be taken care of in the special bonus pool set up for that purpose, consistent with Plaintiff's oral contract with SG Energy. Societe Generale assured Plaintiff that his future compensation as head of SG Energy would be in line with the compensation paid to Jackie Mitchell and Michael Goldstein (the two leaders of the US based operations of RBS Sempra) by RBS Sempra and significantly higher than the compensation paid to Damon Sutter, a senior sales person with RBS Sempra, who reported directly to Mitchell, a number that Plaintiff knew from his discussions with SG Energy's Representatives to be approximately $10,000,000.00.

20.    Plaintiff confirmed this agreement in an email to his then boss, Edouard Neviaski, and numerous oral communications with Neviaski, who never contradicted Plaintiff's understanding.

21.    The compensation agreed upon for Goldstein and Mitchell, on which Plaintiff's compensation was based, consisted of a percentage payout based on the

performance of the business with an added bonus if certain criteria were met in 2011, but no less than $3,000,000, which was Sutter's guaranteed salary for 2011.

22.   The business projections of SG Energy for Years 2 and 3 were $150,000,000 and $300,000,000, respectively.   This would result in compensation to Goldstein and Mitchell under their promised contracts of approximately $5,000,000 to $10,000,000 a year.

23.   In connection with SG Energy's acquisition of RBS Sempra US, Societe Generale had made commitments for $30 million in bonus guarantees to the staff of RBS Sempra US to induce the employees to accept offers of employment with SG Energy.   In addition, in the Spring of 2010, Societe Generale had filed suit against Freepoint Capital, a competitor of RBS Sempra US formed by the former chief executive officer of RBS Sempra, David Messer, to prevent defections of employees and further encourage them to enter into employment contracts with SG Energy.

24.   In order to protect their investment, Societe Generale and SG Energy needed Plaintiff to be very visible as the head of SG Energy.   SG Energy and Societe Generale looked to Plaintiff to be the leader of the new company and Edouard Neviaski and Gonzague Bataille asked Plaintiff repeatedly to speak to the RBS Sempra US staff as the new leader of SG Energy, and to encourage them to stay and work with Plaintiff, with Mitchell and with Goldstein.   Plaintiff was even given the office of the former RBS Sempra President, between the offices of Mitchell and Goldstein at SG Energy's new offices in Connecticut, to show that someone from SG Energy and Societe Generale whom the RBS Sempra US staff respected was present and part of leadership of SG Energy.

25.  Unbeknownst to Plaintiff, however, Edouard Neviaski and other executives of Societe Generale had secretly decided that they did not want an American leading the SG Energy company.  These executives who were employees of Societe Generale, but also controlled the affairs of SG Energy, maintained an anti-American bias that led them to believe that they "they could not trust Americans," and that they "wanted a French person to run the business," that "Americans were difficult to manage and control." Acting on these biases, they decided that they would cause SG Energy to breach its agreement with Plaintiff.  Nevertheless, because they knew that Plaintiff was essential to completing the acquisition of RBS Sempra US by SG Energy, they hid this plan from Plaintiff.  On information and belief, Societe Generale's executives discussed this secret plan with Mitchell, Goldstein and Gonzague at a time when they hid the decision from Plaintiff.  Had Plaintiff known of Societe Generale's intention to cause SG Energy to breach its agreement with Plaintiff, Plaintiff would have immediately resigned from Societe Generale, which Societe Generale and its executives suspected, and which they knew would likely threaten the RBS Sempra US acquisition.

26.  As the acquisition of RBS Sempra approached the critical final stages, Edouard Neviaski told Plaintiff that Societe Generale had determined that Jackie Mitchell and Michael Goldstein, the existing heads of the RBS Sempra US-based operations, would need to be managers of the new business unit in order to provide continuity to the former RBS Sempra US employees and to encourage more of them to accept the contract offers from SG Energy.  He was told that this decision was necessary to make sure that the RBS Sempra US employees did not see the acquisition as a "French takeover."

27.    Concerned about this message, Plaintiff inquired during this meeting with Neviaski as to what his specific title would be.  He was told "not to worry about titles." Concerned that this represented an intention to not honor his oral contract with SG Energy, Plaintiff told Edouard Neviaski that if it was SG Energy's intention not to honor his oral contract, that he had an opportunity with another company that he would immediately accept, and that he was not interested in changing his contract to accept a lesser opportunity.  Plaintiff held several meetings with Neviaski and other SG Energy officials making clear that if SG Energy did not honor his oral contract, he would leave. One official went so far as to inquire whether Plaintiff was "bluffing" in his threat to leave if SG refused to honor its oral contract with him.  Plaintiff assured him that he was not "bluffing."  Neviaski became very concerned at this point because even though the closing of the acquisition had occurred, he needed Plaintiff to complete the sensitive negotiations with the former RBS Sempra US employees to finalize their employment contracts with SG Energy, otherwise, Neviaski knew the deal would be in serious jeopardy.

28.    In order to protect the RBS Sempra US acquisition, Neviaski , on behalf of SG Energy, reaffirmed SG Energy's oral contract with Plaintiff, and told Plaintiff that if he left Societe Generale, "the deal is off," referring to the acquisition of RBS Sempra US by SG Energy.  He "backed off" any attempt by SG Energy to breach its oral agreement with Plaintiff, and instead assured Plaintiff that Plaintiff was going to lead the new company along with the others, and he directed Plaintiff to confer with Jackie Mitchell and Michael Goldstein as to exactly what their titles are to be, making clear that Plaintiff would be leading the new business, but with Jackie Mitchell and Michael Goldstein's management help.  He also reconfirmed SG Energy's oral promise to Plaintiff that the

{N0002525}                                  9

bonus pool that Societe Generale had committed to SG Energy would provide Plaintiff a substantial payout for his efforts in achieving the RBS Sempra US acquisition, an amount that Plaintiff knew from his discussions to be approximately $10,000,000.00. Satisfied with this confirmation of his oral contract with SG Energy, Plaintiff decided to stay with Societe Generale and complete the acquisition of RBS Sempra US.

29. In reliance on what he was told by Edouard Neviaski, Plaintiff met with Jackie Mitchell and Michael Goldstein to discuss and agree on a management arrangement for the new business that met the stated concerns of Societe Generale as communicated to him by Edouard Neviaski. It was decided that Plaintiff would be the President of the new company, and that Michael Goldstein and Jackie Mitchell would be co-CEOs. This decision was immediately communicated to Edouard Neviaski by email, and Edouard Neviaski, knowing that Plaintiff was relying on this management structure, made no objection. In furtherance of this decision, Plaintiff, Michael Goldstein and Jackie Mitchell occupied three offices next to each other signaling to the RBS Sempra US employees that the three of them were the new management team.

30. Nevertheless, unbeknownst to Plaintiff, Edouard Neviaski knew that such a proposal would not be acceptable to Societe Generale, and because it controlled the affairs of SG Energy, it would not allow such a management structure because it did not want an American to lead the business. Instead, Societe Generale had decided to place Gonzague Bataille as head of the new business because he was French. Neviaski hid this decision from Plaintiff because he knew that Plaintiff would leave Societe Generale and jeopardize SG Energy's purchase of RBS Sempra US.

31. In addition to being a direct breach of Plaintiff's contract with SG Energy, Gonzague Bataille had less experience and a less relevant skill set to the type of business

that SG Energy would undertake, but Societe Generale insisted on him as President of the new business unit because of its anti-American bias and desire that an American not be in charge of one of its companies.

32. After Plaintiff had fully performed his part of the oral contract with SG Energy by completing the sensitive employment contract negotiations with the former RBS Sempra US employees on SG Energy's behalf, Plaintiff was informed by Edouard Neviaski that the title of President was "confusing" to Paris-based Societe Generale management and that a new significant leadership role would have to be created for him. Plaintiff was also told in this meeting that it had been decided that Jackie Mitchell and Michael Goldstein would report to Gonzague Batialle as the new head of the business, and that he (Edouard Neviaski) had not quite figured out what they planned for Plaintiff. This was a shock to Plaintiff as he now realized that he had been misled and that Societe Generale would cause SG Energy to breach his oral contract, now that it had used him to achieve the RBS Sempra US acquisition by SG Energy.

33. In the following days, it was confirmed to Plaintiff that this decision had been made weeks before, but that that Plaintiff had been misled so that he would not leave before the acquisition was complete.

34. Despite Plaintiff's demand that SG Energy live up to its oral contract with him, SG Energy refused.

35. On May 22, 2011, Neviaski informed Plaintiff that his new role in SG Energy would be a senior sales position, similar to the one held by Sutter. However, Plaintiff was informed that, even though Sutter had been guaranteed $3,000,000 for the year 2011, Plaintiff would be getting no such guarantees, despite the oral contract he had with SG Energy.

36.     Neviaski informed Plaintiff that, instead of reporting to Edouard Neviaski as before, and as promised, Plaintiff would report to Jackie Mitchell, a colleague who, up until this point, was at the same professional level as Plaintiff. Neviaski also told Plaintiff that his position would prohibit him from serving on the Executive Committee for the Global Commodities Business, a position he held since 2005. Neviaski confirmed to Plaintiff that his new position was essentially a demotion, and a breach of the promises that had been made to him.

37.     Plaintiff was shocked by the information Neviaski relayed to him and informed Neviaski that SG Energy was breaching the Oral Agreement. In an attempt to mitigate his damages, he asked Neviaski if there was an alternative role within Societe Generale available to him because being put into a senior sales position was a significant demotion for Plaintiff and would damage his career.

38.     Neviaski informed Plaintiff that, if he did not accept the senior sales position at SG Energy, there would be no other position available for him and he would be expected to leave.

39.     Neviaski acknowledged that Plaintiff had performed his obligations and duties, understood that what SG Energy and Societe Generale had done to him was unfair, and that he "would try to get [Plaintiff] his deferred compensation as it was the least the Bank could do" under the circumstances "because the RBS Sempra US acquisition would not have occurred without Plaintiff."

40.     That same day, Plaintiff informed Societe Generale's Human Resources Department that he was not satisfied with his demotion and the loss of opportunities it presented. The Human Resources Department informed Plaintiff that his 2010 compensation was not reflective of any work done on the RBS Sempra acquisition and

that Societe Generale had put aside a multi-million dollar package for bonuses to be distributed in 2011 for Societe Generale employees involved in the origination and integration of SG Energy, including Plaintiff.

41.     On March 23, 2011, satisfied that he would receive compensation for his work on the acquisition and origination of SG Energy, Plaintiff emailed Kevin Mepyans, Director of Human Resources for Commodities, and sent a letter to Edouard Neviaksi terminating his employment with Societe Generale (the "Termination Letter"). A copy of the Termination Letter is attached hereto as **Exhibit A**.

42.     On March 24, 2011, Plaintiff received a letter ("Societe Generale Letter") from Andrea H. Stempel, Managing Director and Counsel of Societe Generale, acknowledging receipt of the Termination Letter. A copy of the Societe Generale Letter is attached hereto as **Exhibit B**.

43.     The Societe Generale Letter acknowledged Plaintiff's "new role" and change in title and reporting line. *See* Exhibit B ¶ 2.

## FIRST CLAIM FOR BREACH OF ORAL AGREEMENT

44.     Plaintiff incorporates by reference paragraphs 1-43.

45.     SG Energy entered into the Oral Agreement with Plaintiff.

46.     Plaintiff fully performed all of his obligations under the Oral Agreement.

47.     SG Energy breached the Oral Agreement after accepting Plaintiff's full performance.

48.     Societe Generale and SG Energy caused Plaintiff to suffer significant economic damages as a result of SG Energy's breach of the Oral Agreement.

49.     SG Energy is liable to Plaintiff for his damages equal to the promised compensation under the Oral Agreement.

## SECOND CLAIM FOR PROMISSORY ESTOPPEL

50.    Plaintiff incorporates by reference paragraphs 1-43.

51.    SG Energy clearly and unambiguously promised Plaintiff that, if he fulfilled the terms of the Oral Agreement, he would be compensated in accordance with the Oral Agreement.

52.    Plaintiff reasonably relied upon SG Energy's promise by relinquishing his rights under the 2010 Employment Agreement, undertaking his duties under the Oral Agreement, with the reasonable expectation that would fulfill its obligations under the Oral Agreement.

53.    Plaintiff performed his obligations under the Oral Agreement and was repeatedly assured that SG Energy would perform its obligations under the Oral Agreement.

54.    Once Plaintiff completed his performance under the Oral Agreement, thereby substantially enriching SG Energy, SG Energy's representatives informed Plaintiff that it would not fulfill its obligations under the Oral Agreement.

55.    Plaintiff reasonably relied to his detriment upon SG Energy's promises.

56.    Having received the benefits of Plaintiff's performance under the Oral Agreement, SG Energy is estopped from reneging on their promises under the Oral Agreement.

## THIRD CLAIM FOR UNJUST ENRICHMENT

57.    Plaintiff incorporates by reference paragraphs 1-43.

58.    The acquisition by SG Energy of RBS Sempra US was accomplished because of the unique contacts and skills of Plaintiff.

59.     As repeatedly acknowledged by SG Energy, it could not have acquired RBS Sempra US but for Plaintiff's leadership in the process.

60.     In order to ensure Plaintiff's acquisition of RBS Sempra US for the benefit of SG Energy, SG Energy entered into the Oral Agreement and repeatedly assured Plaintiff that he would be compensated in accordance with the Oral Agreement.

61.     Plaintiff fulfilled his duties under the Oral Agreement by arranging for SG Energy to acquire RBS Sempra US.

62.     Plaintiff fulfilled these duties in direct reliance upon the Oral Agreement at his own expense because, but for the Oral Agreement, Plaintiff could have procured RBS Sempra US for another financial institution which would have compensated Plaintiff for his role in the acquisition.

63.     Under these circumstances, equity and good conscience require SG Energy to make restitution to Plaintiff in the amount promised in the Oral Agreement.

## FOURTH CLAIM FOR VIOLATION OF TITLE VII

64.     Plaintiff incorporates by reference paragraphs 1-43.

65.     SG Energy denied Plaintiff advancement opportunities motivated by his national origin, namely American.

66.     SG Energy denied Plaintiff the managerial position it promised him because of his national origin, and instead gave the position to a French national.

67.     SG Energy discriminated against Plaintiff with respect to his compensation, terms, conditions, and privileges of employment by reason of his national origin, in violation of Title VII, 42 U.S.C. Section 2000e *et seq.*

68.     As a direct and proximate result, Plaintiff has been damaged in an amount to be determined at trial.

69.     Plaintiff has satisfied all conditions precedent to bringing this action.

**FIFTH CLAIM FOR VIOLATION OF THE NEW YORK EXECUTIVE LAW § 296**

70.     Plaintiff incorporates by reference paragraphs 1-43.

71.     SG Energy denied Plaintiff advancement opportunities because of his national origin, namely, American.

72.     SG Energy denied Plaintiff a managerial position because of his national origin, namely, American, and instead awarded the position to a French national.

73.     SG Energy discriminated against Plaintiff in the terms, conditions and privileges of employment by reason of his national origin, in violation of Section 296 *et seq.* of the New York Executive Law.

74.     As a direct and proximate result, Plaintiff has been damaged in an amount to be determined at trial.

75.     Plaintiff has satisfied all conditions precedent to bringing this action.

**WHEREFORE**, Plaintiff demands judgment against SG Energy as follows:

A.  On the first claim for breach of contract, an award of compensatory damages in an amount equal to the value of the Oral Contract;

B.  On the second claim for promissory estoppel, an award of the promised compensation on the basis of the Oral Contract;

C.  On the third claim for unjust enrichment, an award of the total amount by which SG Energy was enriched by its acquisition of RBS Sempra US;

D. On the fourth claim for Title VII violation, an award of damages to be determined at trial;

E. On the fifth claim for violation of NY Executive Law § 296, an award of damages to be determined at trial;

F.  On all claims, prejudgment interest, attorneys' fees and costs; and

G.  Such other and further relief as this Court deems just and proper.


September 23, 2011

                                        **BECKER & POLIAKOFF LLP**

                                By:  _____
                                        Helen D. Chaitman

                                        Andrew Byrne, Esq.
                                        Valerie Sirota, Esq.
                                        45 Broadway, 8th Floor
                                        New York, New York 10006
                                        (212) 599-3322
                                        *Attorneys for Plaintiff Adrian Lismore*

# EXHIBIT A

21 Sailfish Road,

Vero Beach,

Florida 32960

March 23, 2011

To whom it may concern;

As a result of the various proposed changes in my role I have concluded that I can no longer fulfill my role within SG and effective immediately I am concluding that the changes made to my role and responsibilities constitute a material change and as such can only conclude that the Bank has put in place conditions that have effectively lead to a constructive dismissal.

I would therefore conclude that any notice period and or non competition period has commenced as of the date of this letter.

I look forward to working with the Bank in an amicable manner to exit my position.

Regards,

Adrian F. Lismore

EXHIBIT B



**SOCIETE GENERALE**
Corporate & Investment Banking

**VIA FEDERAL EXPRESS AND E-MAIL (Lismoreaf@me.com)**

March 24, 2011

Mr. Adrian Lismore
c/o The Four Seasons Hotel
1300 Lamar Street
Houston, TX 77010-3017

**Andrea Stempel**
Managing Director and Counsel
Main Tel.  212 278 7169
Fax.       212 278 2050
andrea.stempel@sgcib.com

Dear Mr. Lismore:

We acknowledge receipt of your e-mail to Kevin Mepyans and the letter that you provided to Edouard Neviaski, both dated March 23, 2011, which have been referred to me for response. We regret that you have chosen to end your employment relationship with Société Générale ("SG").

We understand from your correspondence that you believe that you have been constructively discharged. Although changes to your title and reporting line were in process, these changes do not represent a material reduction in your duties, title or compensation, nor do they form the basis for a claim of constructive termination. In fact, as you know, the very responsibilities, strategies and objectives with which you were charged in your position as Product Line Manager for Energy were to be the primary focus of your role as a Managing Director on marketing and integrating Société Générale Energy Corp. following the RBS Sempra transaction. Moreover, the new role, even beyond that of Product Line Manager, would have afforded you an opportunity for both staff management and enhanced compensation. Accordingly, we were disappointed by your sudden notice of departure, especially given your years of employment with SG.

Please be advised that SG deems your termination decision as voluntary and a resignation. As your March 23 letter recognizes and pursuant to the terms of your employment contract dated August 6, 2010 (the "Employment Agreement"), you have certain continuing obligations to SG. A copy of your Employment Agreement is attached for your review. SG shall accept your resignation effective June 21, 2011, which date shall be your effective date of termination. You shall remain on paid garden leave through your 90-day notice period and you shall not be required to report for work or to execute your duties during such time.

In addition, and running from the effective date of termination, you have a one (1) month (salary-paid) restriction on competition and a twelve (12)- month non-solicitation of employees. Your Employment Agreement also precludes client solicitation for a period of five (5)-months following the date you tendered notice. Relocation Assistance payments and arrangements provided pursuant to Paragraph 3 of your Employment Agreement shall cease as of June 30, 2011. On account of your resignation, and except as noted above or with respect to accrued but unused vacation days, you shall have no entitlement to salary, bonus or other form of compensation from SG. The vesting and payment of deferred compensation

# SOCIETE GENERALE
## Corporate & Investment Banking

Mr. Adrian Lismore
March 24, 2011
Page 2

amounts shall be governed by the terms and conditions of the SG-USA Fidelity Bonus Plan, including those relating to resignation of employment.

SG expects that you will honor all your obligations under your Employment Agreement, uphold your fiduciary duties as an officer of SG, and observe all applicable SG policies. Please contact Kevin Mepyans at (212) 278-6383 to discuss the return of Company property or with any questions concerning health or relocation benefits.

We wish you much success in the future.

Sincerely,

Andrea H. Stempel

cc: Mr. Edouard Neviaski
    Mr. Gonzague Bataille
    Mr. Kevin Mepyans



**SOCIETE GENERALE**
Corporate & Investment Banking

August 6, 2010

**Thornton Jenness II**
Managing Director
Human Resources

Tel.   212 278 7518
Fax.   212 278 7446
thornton.jenness@sgcib.com

Mr. Adrian Lismore
18 Caroline Terrace
London, England SW1W 8JT

Dear Adrian:

We are pleased to offer you the position of Product Line Manager for Energy in the Commodities Derivatives Department o f Société G énérale ( "SG" o r the "Company"), which position shall be based in Houston, Texas.   This letter will outline the terms of your employment pursuant to this opportunity.   However, this letter is not a guarantee of employment for any term or duration, since your employment with SG will be "at will," as defined under New York law.  As more fully set forth below, this Agreement shall supersede any and all prior employment agreements and letters concerning your employment with SG, including but not limited to the offer letter dated August 3, 2010..

1.      <u>Term</u>.  This letter provides the details of your compensation for the period commencing on or about October 1, 2010 through September 30, 2013 (the "Term") and certain other terms and conditions of, and that continue through, your employment with the Company unless restricted to the Term or as otherwise specified.

2.      <u>Compensation and Benefits</u>.

a.              a.      You will be paid a base salary at the rate of Three Hundred Twenty Five Thousand Dollars ($325,000.00) per annum, less applicable tax and payroll deductions, payable in accordance with SG's prevailing payroll practices ("B ase Salary").  Any obligation to pay your Base Salary will cease upon the termination of your employment.

b.      For each fiscal year ending December 31, you shall be eligible for an annual performance bonus, payable in the following year, between March 1 and March 31, provided that you are actively employed by SG at the time bonus payments are made and have not given notice of resignation or your intent to resign, or have been notified of termination of your employment for Cause (as defined below) or suspension of your employment for any reason.   Annual bonuses shall be at the sole discretion of SG management, payable in accordance with SG's payroll practices, bonus policies and compensation plans, including but not limited to the SG-USA Fidelity Bonus Plan (the "Plan"), in effect at the time of payment.   The details concerning the Plan, which SG reserves the right to amend, are available upon request.

Societe Generale
1221 Avenue of the Americas
New York, NY 10020

# SOCIETE GENERALE
Corporate & Investment Banking

August 4, 2010
Page 2

    c.       You will continue to participate in and receive benefits on the same basic terms and conditions as SG employees of similar position, rank and status in accordance with the terms and eligibility requirements of SG's benefit plans, which may be modified, suspended or terminated by SG in its sole discretion.

    3.    <u>Relocation Assistance.</u>  You also shall receive the following in connection with your relocation to Houston:

    a.       A gross annual *Housing Allowance* of $45,000 for all or that part of the Term that you remain employed with SG, which shall be paid in bi-weekly installments along with your salary;

    b.       A one-time reimbursement of the fee charged by a real estate broker in connection with the lease of a residence in Houston, which reimbursement shall not exceed $5,000 net;

    c.       *Temporary Housing Accommodations* as arranged by SG for up to two (2) months upon your initial relocation from London to Houston;

    d.       *Tax Assistance* for the transition year (2010) as well as any future year for which you are required to pay income tax in London in association with your assignment there;

    e.       A *Mobility Premium* of $3,600 net, payable to you within thirty (30) days of your commencing active employment in Houston;

    f.       A gross *Educational Allowance* of $40,000 to help defray the out-of-state cost of educational expenses for your partner, subject to your providing satisfactory documentation of his matriculation in a Masters Degree program, which amount shall be paid in bi-weekly installments along with your salary;

    g.       Two (2) one-way Business Class *Airline Tickets* for you and your partner to relocate from London to Houston;

    h.       *Moving Costs* for a maximum amount of 20 cubic meters per adult, from London to the US, as well as out of US storage (moving costs shall not include any amounts related to transport to or from the Bahamas); and

    i.       Reimbursement for the amount you are assessed or held responsible to pay to *break your apartment lease* in London, up to a maximum of six months' rent in the amount of 9,100 GBP per month..

    4.    <u>Policies.</u>  During your employment you may not, without prior written consent, accept an appointment, whether or not for remuneration, as a Director, Officer, Manager or employee of a business entity that is not affiliated with the Company. Except as



**SOCIETE GENERALE**
**Corporate & Investment Banking**

Mr. Adrian Lismore
August 6, 2010
Page 3

specifically set forth herein, you shall be subject to and must comply with all Company policies and procedures applicable to SG employees of similar rank and status, as now existing or as may be modified or supplemented by SG in its sole discretion.

5.    Non-Disclosure of Confidential Information.    During your employment or following the termination of your employment, you shall not directly or indirectly disclose or furnish to any entity, firm, corporation or person, except as otherwise required by law, any confidential or proprietary information of the Company with respect to any aspect of its operations, business or clients.    "Confidential or proprietary information" shall mean information generally unknown to the public to which you gain access by reason of your employment by the Company and includes, but is not limited to, trade secrets, information relating to all present or potential customers, business and marketing plans, sales, trading and financial data and strategies, salaries and employment benefits, and operational costs.

6.    Company Property.    All records, files, memoranda, reports, customer information, client lists, documents and equipment relating to the business of the Company, which you prepare, possess or come into contact with while you are an employee of the Company, shall remain the sole property of the Company. You agree that upon the termination of your employment, you shall provide to the Company all documents, papers, files or other material in your possession and under your control that are connected with or derived from your services to the Company.  The Company owns all work product, patents, copyrights and other material produced by you during your employment with the Company.

7.    Notice of Retirement/Resignation.    You shall not voluntarily retire, resign or otherwise terminate your employment relationship with the Company or any of its affiliates without first giving the Company at least ninety (90) days' prior written notice of the effective day of your retirement, resignation or other termination.  Such written notice shall either be (a) tendered in person to the HR generalist supporting your business unit or a Managing Director in the Human Resources Department in New York City or (b) sent by certified mail to Société Générale, Attn:  Human Resources Department, 1221 Avenue of the Americas, New York, NY  10020.  The Company retains the right to place you on paid leave for all or part of this notice period or to waive the notice requirement in whole or in part. In the event of the Company's waiver of all or part of the notice period, you shall not be paid wages or continue to accrue vacation days during the waived period.  In the alternative, at any time after you give notice, the Company may, but shall not be obligated to, provide you with work and (i) require you to comply with such conditions as it may specify in relation to transitioning your duties and responsibilities; (ii) assign you other duties; (iii) withdraw any powers vested in, or duties assigned to you; or any combination of the above.

8.    Non-Solicitation of Employees.    You agree that if you voluntarily terminate your employment or if your employment is terminated for any reason, you shall not, for a period of twelve (12) months following the effective date of termination, without the Company's prior written consent, directly or indirectly: (a) solicit or induce, or cause others to solicit or induce, any employees of the Company to leave the Company or in any way modify their relationship with the Company; (b) hire or cause others to hire any employees



**SOCIETE GENERALE**
Corporate & Investment Banking

Mr. Adrian Lismore
August 6, 2010
Page 4

of the Company; or (c) encourage or assist in the hiring process of any employees of the Company or in the modification of any such employee's relationship with the Company, or cause others to participate, encourage or assist in the hiring process of any employees of the Company.  These same restrictions apply during your employment with SG such that you may not act to divert, interfere with or negatively affect any existing or prospective employment relationship with the Company.

       9.   <u>Non-Solicitation of Clients/Customers</u>.  For a period of five (5) months following notice of resignation or termination, or for a period of three (3) months following the involuntary termination of your employment by the Company for any reason, you shall not, without the Company's prior written consent, and with respect to any products, services, trade secrets or other matters in which the Commodities Derivatives department is active, whether in the United States, Canada, or the country in which you were last employed or assigned: (a) directly or indirectly solicit the trade or patronage of any clients or customers or any prospective clients or customers of the Company; or (b) attempt to interfere with any ongoing or prospective business relationship between the Company and its clients.  These same restrictions apply during your employment with SG such that you may not act to divert, interfere with or negatively affect any existing or prospective client or business relationship with the Company.

       10.   <u>Non-Competition</u>.  Unless the Company has waived in writing all or part of the Notice Period set forth in Paragraph 7 above or this Non-Competition restriction, you shall not, for a period of one (1) month after your resignation or voluntary termination, directly or indirectly engage in, own or control any interest in, or act as an officer, director, employee of, or consultant or advisor to, any firm, corporation, institution or entity directly or indirectly engaged in trading, marketing, research or other activities relating to commodity derivatives, either physical or financial, including but not limited to futures, over-the-counter products, commodity indices, or commodity-linked equity derivatives, in the areas of energy, base metals, precious metals, agricultural and environmental products and competing with SG in the Americas, or your country of last employment or assignment. The Company shall pay your base salary rate, less applicable deductions, for this Non-Competition period.  However, if the Company wishes, it may waive this non-compete provision, in which case you will not be paid the base salary.  By signing below, you agree that this Non-Competition provision would not prevent you from working or becoming employed in a job that suits your education, qualifications, skills and experience.

       11.   <u>Arbitration</u>.  Any and all disputes arising out of or relating to this Agreement, your employment or the termination of your employment with SG, including any statutory claims based on alleged discrimination, will be submitted to and resolved exclusively by a multi-arbitrator panel of the American Arbitration Association (AAA) and pursuant to the AAA National Rules for the Resolution of Employment Disputes.  The arbitration shall be held in the City of New York.  In agreeing to arbitrate your claims, you recognize that you are waiving your right to a trial in court and by a jury.  The arbitration award shall be binding upon both parties, and judgment upon the award may be entered in a court of competent jurisdiction.

**SOCIETE GENERALE**
Corporate & Investment Banking

Mr. Adrian Lismore
August 6, 2010
Page 5

12.    <u>Injunctive Relief</u>.  In the event of a breach by you of your obligations under this Agreement, the Company, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  You acknowledge that the Company shall suffer irreparable harm in the event of a breach or prospective breach of paragraphs 5, 6, 7, 8, 9 and/or 10 hereof and that monetary damages would not be adequate relief.  Accordingly, the Company may obtain a temporary restraining order or preliminary injunction (i) in aid of arbitration and/or (ii) to prevent irreparable injury from occurring pending the commencement or completion of an arbitration under this Agreement.  You agree to submit to the jurisdiction of any available federal or state court located in New York City for such proceedings.  You further agree that the Company and its affiliates shall be entitled to recover all costs and expenses (including attorneys' fees) incurred in connection with the enforcement of the Company's rights hereunder.

13.    <u>Complete Agreement</u>.  The provisions herein contain the entire agreement and understanding of the parties regarding compensation and your employment and fully supersede any and all prior agreements, representations, promises or understandings, written or oral, between them pertaining to the subject matter hereof.  The provisions of this offer may not be changed or altered except in writing signed by you and a duly authorized agent of SG.

14.    <u>Choice of Law</u>.  The interpretation and application of the terms herein, and your employment relationship at SG, shall be governed by the laws of the State of New York without regard to principles of conflict of laws.

15.    <u>No Waiver</u>.  Any failure by either party to exercise its rights to terminate this offer or to enforce any of its provisions shall not prejudice such party's rights of termination or enforcement for any subsequent or further violations, breaches or defaults by the other party.  A waiver of any provision of this offer shall not be valid or effective unless memorialized in writing and signed by both parties to this Agreement.

16.    <u>Severability</u>.  Should any provision herein be rendered or declared legally invalid or unenforceable by a court of competent jurisdiction or by the decision of an authorized governmental agency, such invalidation of such part shall not invalidate the remaining portions thereof.

17.    <u>Assignment</u>.  The rights and obligations of SG under this offer will be transferable, and all of its covenants and agreements will be binding upon and be enforceable by its successors and assigns.  You may not assign this offer of employment and the terms and conditions stated herein.



## SOCIETE GENERALE
### Corporate & Investment Banking

Mr. Adrian Lismore
August 6, 2010
Page 6

      Please indicate your acceptance of these terms by signing and returning this letter. Should you have any questions, please do not hesitate to contact Thornton Jenness with the Human Resources Department at (212) 278-7518.

Sincerely,

SOCIETE GENERALE

By: _____

Name:     Thornton Jenness

Title:      MD – Human Resources

AGREED AND ACCEPTED

Signed: _____

Date:    8 | 8 | 10

Anticipated Transfer Date: _____