UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

Adrian Lismore,

               Plaintiff,

    -v-

Société Générale Energy Corporation,

               Defendant.

----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: AUG 17 2012

11 Civ. 6705  (AJN)

MEMORANDUM
AND ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Adrian Lismore ("Lismore") brings this action alleging breach of contract, promissory estoppel, unjust enrichment and discrimination arising from work that he performed relating to the establishment of Société Générale Energy Corporation ("SG Energy"), a Connecticut-based subsidiary of Société Générale ("SG"), and its merger with RBS Sempra US in 2010.  Because Plaintiff's employment contract with SG contained a broad arbitration clause covering all matters arising out of or relating to his employment, Defendant's Motion to Dismiss and Compel Arbitration is GRANTED.

## I.    STANDARD OF REVIEW

"Through the FAA, Congress has declared a strong federal policy favoring arbitration as an alternative means of dispute resolution." *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.,* 189 F.3d 289, 294 (2d Cir. 1999).  Still, arbitration "is a matter of contract and a party cannot be required to submit to arbitrate any dispute which he has not agreed so to submit." *FSP, Inc. v. Societe Generale*, 350 F.3d 27, 30 (2d Cir. 2003) (quoting *United Steel Workers of Am. v. Warrier & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  "[C]ourts should order

arbitration of a dispute only where the court is satisfied that neither the formation of the parties'

arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an

arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co. v. Int'l*

*Bhd. of Teamsters*, 130 S. Ct. 2847, 2858–59 (2010) (emphasis in original). "In this endeavor, as

with any other contract, the parties' intentions control." *UBS Fin. Servs., Inc. v. W. Virginia*

*Univ.*, 660 F.3d 643, 661 (2d Cir. 2011) (quoting *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*,

130 S.Ct. 1758, 1774 (2010)).

In a typical motion to compel arbitration, the Court would apply a standard similar to that

of a summary judgment motion, *DuBois v. Macy's East Inc.*, 338 F. App'x 32, 33 (2d Cir. 2009),

and some discovery may be allowable or necessary.  In this instance, the Court permitted

Defendant to move for dismissal in favor of arbitration prior to the taking of any discovery on

the premise that arguments would be based only on allegations contained in the Complaint.

(3/21/12 Tr. at 28).  Therefore, for purposes of deciding this motion, the Court does not look

beyond the allegations in the Complaint and exhibits attached thereto by Plaintiff, and accepts all

factual allegations in the Complaint as true.  *Cf. Guydan v. Aetna, Inc.*, 544 F.3d 376, 379 n.1 (2d

Cir. 2008) ("Because the district court dismissed Guyden's complaint  [as subject to arbitration]

without addressing its merits, we treat the allegations therein as true.").

## II.    BACKGROUND

The following facts are averred in the Complaint and the Court accepts them as true for

purposes of this motion.

Plaintiff held a number of positions at SG between 2004 and 2011 as he was steadily

promoted from Co-Head of Commodity Derivative Sales for the Americas in 2004 to becoming

Global Head of Corporate Commodity Sales in 2009 and Co-Head of Energy in 2010.  (Compl. ¶

2

5).  In 2010, Lismore entered into a contract with SG (the "2010 Written Agreement") to become

Product Line Manager in Houston beginning on October 1, 2010.  (Compl. ¶ 6–9).  The 2010

Written Agreement between SG and Lismore contained an arbitration clause.  (*See* Compl. ¶ 10,

Ex. B ¶ 11).

The first paragraph of the 2010 Written Agreement states that "this Agreement shall

supersede any and all prior employment agreements and letters concerning your employment

with SG . . . ."  (Compl. Ex. B).  Paragraph Thirteen states that the "provisions of this offer may

not be changed or altered except in writing signed by you and a duly authorized agent of SG."

(*Id.* ¶ 13).  There is also an assignment clause stating that "[t]he rights and obligations of SG

under this offer will be transferable, and all of its covenants and agreements will be binding upon

and be enforceable by its successors and assigns."  (*Id.* ¶ 17).  Additionally, under a paragraph

titled "Policies," the agreement provides that "During your employment, you may not, without

prior written consent, accept an appointment . . . as a Director, Officer, Manager or employee of

a business entity that is not affiliated with [SG]."  (*Id.* ¶ 4).

According to the Complaint, "before the effective date of the [employment contract] . . .

Plaintiff became aware of an opportunity to acquire RBS Sempra US.  Société Générale asked

Plaintiff to use his personal contacts and expertise to lead the negotiations for the acquisition by

Defendant SG Energy of RBS Sempra US, and thereafter become the head of the new business

unit.  Plaintiff agreed to fulfill these tasks pursuant to an oral agreement with SG Energy," a

"grandchild" subsidiary of SG.  (Compl. ¶ 11).  This separate agreement was necessary under

applicable banking laws, the Complaint alleges, "because SG did not have a banking license in

Connecticut, where SG Energy was based at the time."  (Compl. ¶ 17).

In reliance on the oral agreement, Plaintiff began working on SG Energy's acquisition of RBS Sempra US. (Compl. ¶¶ 14–16). Unbeknownst to Plaintiff, SG executives who "controlled the affairs of SG Energy" harbored an anti-American bias and were plotting to remove Plaintiff from his position. (Compl. ¶ 25). Plaintiff knew that he was essential to closing the SG Energy-RBS merger deal and threatened to leave if the terms of the oral agreement were not maintained. (Compl. ¶ 27). "One official went so far as to inquire whether Plaintiff was 'bluffing' in his threat to leave if SG refused to honor its oral agreement with him." (*Id.*). "In order to protect the RBS Sempra US acquisition, [SG executive Edouard] Neviaski, on behalf of SG Energy, reaffirmed SG Energy's oral contract with Plaintiff . . . ." (Comp. ¶ 28). Plaintiff alleges that "this was a second oral contract with Lismore and it was entered into exclusively with SG Energy." (Opp. Br. at 5).

"After Plaintiff had fully performed his part of the oral contract with SG Energy," Neviaski informed Plaintiff that he would not receive the previously agreed upon title as "President" of the new RBS-SG Energy entity. (Compl. ¶ 32). "Neviaski informed plaintiff that if he did not accept [an inferior position] at SG Energy, there would be no other position available for him and he would be expected to leave." (Compl. ¶ 38). "That same day, Plaintiff informed SG's Human Resources Department that he was not satisfied with his demotion . . . . The Human Resources Department informed Plaintiff that his 2010 compensation was not reflective of any work done on the RBS Sempra acquisition and that SG had put aside a multi-million dollar package for bonuses to be distributed in 2011 for SG employees involved in the origination and integration of SG Energy, including Plaintiff." (Compl. ¶ 40).

On March 23, 2011, Plaintiff sent a letter "terminating his employment with Société Générale." (Compl. ¶ 41). This letter was sent to Neviaski and to SG's Director of Human

Resources for Commodities and stated, "I have concluded that I can no longer fulfill my role within SG . . . ." (Comp. ¶ 41; Ex. A). The next day, Plaintiff received a confirmation from Andrea Stempel, Managing Director and Counsel of SG stating "[w]e regret that you have chosen to end your employment relationship with Société Générale ('SG')." (Comp. ¶ 42; Ex. B).

On September 26, 2011, Plaintiff filed the present Complaint naming only SG Energy as a defendant. Plaintiff's complaint alleges breach of contract, promissory estoppel, and unjust enrichment—all related to the alleged oral agreements—as well as two claims for discrimination based on Plaintiff's status as an American citizen. (Compl. ¶¶ 25, 44–75).

## III. PLAINTIFF CANNOT ESCAPE HIS OBLIGATION TO ARBITRATE THE QUESTION OF THE 2010 WRITTEN AGREEMENT'S CONTINUED EXISTENCE AND VIABILITY

Plaintiff does not dispute that the 2010 Written Agreement, to which Plaintiff signed his name on August 8, 2010, contains a broad arbitration clause. (Opp. Br. at 3). Nonetheless, in an artful but ultimately unsuccessful attempt to avoid Plaintiff's obligation to arbitrate pursuant to the 2010 Written Agreement, the Complaint avers that Plaintiff's oral agreement regarding the RBS Sempra deal "was not contemplated by the 2010 Employment Agreement and represented an entirely new agreement between Plaintiff and SG Energy. *Therefore*, Plaintiff's 2010 Employment Agreement was conclusively terminated once SG Energy and Plaintiff entered into the Oral Agreement." (Compl. ¶ 12) (emphasis added). As discussed below, this averment does not allow Plaintiff to escape his obligation to arbitrate this dispute because (a) it is a legal conclusion couched as a factual allegation that the Court need not credit, (b) it is contradicted by other more specific allegations in the Complaint and the exhibits attached thereto, and (c) the

5

arbitration agreement provides that any questions as to the agreement's continued existence and validity are for an arbitrator to decide.

> a. The Court Need Not Accept as True Conclusions of Law Couched as Factual Allegations

Plaintiff asserts that because the oral agreement was not contemplated by the 2010 Written Agreement, it "therefore" terminated that agreement. (Compl. ¶ 12). This logic is a legal conclusion as to the consequence of the oral agreement as it relates to the continued viability and enforceability of the 2010 Written Agreement, and one for which Plaintiff cites no supporting legal authority. Because the Court is not aware of any legal authority holding that an employee's oral employment agreement with an employer's subsidiary automatically terminates a preexisting employment agreement with the parent entity, the Court rejects this legal conclusion.

> b. The Court Need Not Accept as True General Assertions Contradicted by More Specific Allegations in the Complaint and Exhibits Attached Thereto

Nor does the Court credit Plaintiff's conclusion that the 2010 Written Agreement was "terminated" because this general conclusion is directly contradicted by more specific averments in the Complaint and exhibits attached thereto. Indeed, even if this were a 12(b)(6) motion, the Court still would not need to credit general allegations that are belied by more specific facts in the Complaint. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("[C]onclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."); *see also Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2011) (noting the "narrow exception" to the principle that allegations should be accepted as true on a motion to dismiss in circumstances where "factual assertions . . . are contradicted by the complaint itself, [or] by documents upon which the pleadings rely . . . .").

6

The Complaint avers that on March 23, 2011, Plaintiff "sent a letter to [SG employee] Edouard Neviaski *terminating his employment with Société Générale.*" (Compl. ¶ 41) (emphasis added). In this letter, Lismore wrote, "I have concluded that I can no longer fulfill *my role within SG* . . . ." (Compl. Ex. A) (emphasis added). The next day, Andrea Stempel, SG's Managing Director and Counsel, responded to Lismore's letter, writing "[w]e regret that you have chosen to end *your employment relationship with Société Générale.*" (Compl. Ex. B) (emphasis added).

Furthermore, contrary to any assertion that Plaintiff's alleged subsequent oral agreements were solely with SG Energy, as distinct from SG, the Complaint avers that when Plaintiff became concerned that his first alleged oral agreement was not being honored, one official inquired whether he was bluffing "in his threat to leave if *SG* refused to honor its agreement with him." (Compl. ¶ 27) (emphasis added). After the first oral agreement was reaffirmed by a second oral agreement, "Plaintiff decided to stay with Société Générale and complete the acquisition of RBS Sempra US." (Compl. ¶ 28).

Moreover, the language of the 2010 Written Agreement contradicts any notion that (1) the agreement did not contemplate Plaintiff entering into additional agreements with affiliates of SG and (2) such additional agreements would perforce terminate the 2010 Written Agreement. For example, the 2010 Written Agreement contemplated and provided for its transferability and assignability. (*Id.* ¶ 17). In explicitly prohibiting Lismore from accepting without consent "an appointment . . . as a Director, Officer, Manager or employee of a business entity *that is not affiliated with [SG],*" (*Id.* ¶ 4) (emphasis added), the agreement implicitly contemplated that Lismore might, within the scope of or in combination with the agreement, accept a position as a director, officer, manager of or employee of a business that *is* affiliated with SG. Given these

7

passages in the 2010 Written Agreement, the Court cannot and does not accept the assertion in paragraph 12 of the Complaint that an oral agreement with another SG affiliate would necessarily terminate the 2010 Written Agreement.

These more detailed averments and exhibits to the Complaint undermine the conclusory assertion that the execution of the alleged oral agreement terminated Plaintiff's employment with SG. Thus, the Court need not and does not credit the conclusory assertion that the alleged oral agreement "conclusively terminated" the 2010 Written Agreement. As a result, there is no sufficient allegation in the Complaint that the arbitration clause in the 2010 Written Agreement does not govern any dispute arising from Plaintiff's employment with SG subsequent to the execution of that agreement and subsequent to related oral agreements.

    c.  <u>The 2010 Written Agreement Delegates to an Abitrator the Question of its Continued Existence and Validity</u>

Even if there is a dispute as to whether the 2010 Written Agreement between Plaintiff and SG was somehow terminated by an oral agreement that Plaintiff entered into with SG's grandchild subsidiary, Defendant correctly argues that such a dispute would be for an arbitrator to resolve. (Reply at 3; 5/2/12 Tr. at 5–6). While there is a general presumption that questions of arbitrability should be resolved by the courts, *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995), the issue of arbitrability may be submitted to an arbitrator when "there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Solutions, Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 565-66 (2d Cir. 2002)). Thus, the Second Circuit has held that when an arbitration clause incorporates by reference the American Arbitration

8

Association's ("AAA") rule that arbitrators are to determine their own jurisdiction, this incorporation "serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec*, 398 F.3d at 208. Therefore, a party who signs "a contract containing an arbitration clause and incorporating by reference the AAA rules . . . cannot [later] disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability." *Id.* (emphasis in original).

The 2010 Written Agreement's arbitration clause incorporates by reference the AAA's Rules for the Resolution of Employment Disputes (Compl. Ex. C ¶ 11), which provides that an "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[1] The 2010 Written Agreement's arbitration clause is almost identical to the one that the *Contec* court held sufficient to delegate the question of an arbitration agreement's "continued existence, validity and scope" to arbitrators. *Contec*, 398 F.3d at 211. Under these circumstances, *Contec* requires the conclusion that the 2010 Written Agreement delegates to arbitrators the decision on arbitrability, including the question of the agreement's continued existence and viability.[2]

Indeed, the *Contec* Court held that it need not "reach the question" of whether the plaintiff was "estopped from avoiding arbitration" with a defendant who was not a signatory to

---

[1] *See* AAA National Rules for the Resolution of Employment Disputes 6(a), *available at* http://www.adr.org/aaa/faces/aoe/lee/lee_search/lee_rule/lee_rule_detail?doc=ADRSTG_004366&_afrLoop=28672 84245827345&_afrWindowMode=0&_afrWindowId=vdoxhjepd_6#%40%3F_afrWindowId%3Dvdoxhjepd_6%26 _afrLoop%3D2867284245827345%26doc%3DADRSTG_004366%26_afrWindowMode%3D0%26_adf.ctrl-state%3Dvdoxhjepd_67 (last visited July 26, 2012).

[2] The present case is distinguishable from *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011), where a second employment agreement contained a clause directly contrary to the arbitration clause in a prior agreement. In the present case, there is no allegation that the oral agreement contained any provision explicitly disclaiming arbitration. The question is instead focused on the continued existence and validity of the 2010 Written Agreement's broad arbitration clause, and *Contec* therefore governs.

the agreement under circumstances indicating "that arbitration of the issue of arbitrability is appropriate." *Id.* at 209. In reaching this conclusion, the Second Circuit considered three factors that were present in that case: (1) there "was an undisputed relationship between" the parties, (2) the plaintiff signed the agreement containing an arbitration clause, and (3) the dispute at issue arose because the parties continued to conduct themselves as subject to the agreement with the arbitration clause. *Contec*, 398 F.3d at 209 ("These factors demonstrate that a sufficient relationship existed between [the parties] to permit [the non-signatory] to compel arbitration even if, in the end, an arbitrator were to determine that the dispute itself is not arbitrable . . . .").

All three of these factors exist in the present case. First, there was indisputably an employer-employee relationship between Lismore and SG. Second, Lismore signed an agreement containing a broad arbitration clause. And third, the allegations in the Complaint illustrate that the parties did in fact continue conducting themselves as though Plaintiff was working for SG. Hence, when Plaintiff offered his letter of resignation on March 23, 2011, he submitted it to *SG*. (Compl. ¶ 41, Ex. A). In that letter, Plaintiff wrote to Neviaski, an SG employee, "I have concluded that I can no longer fulfill my role within SG." (*Id.*). The next day, Andrea Stempel, SG's Managing Director and Counsel, responded by writing, "[w]e regret that you have chosen to end your employment relationship with Société Générale ('SG')." (Compl. Ex. B). The Complaint specifically alleges that these letters—sent subsequent to both alleged oral agreements—had the effect of "terminating [Plaintiff's] employment with Société Générale." (Compl. ¶ 41). These averments in the Complaint indicate that the parties continued to conduct themselves as if there was still an employment agreement between Plaintiff and SG up until the time that Plaintiff resigned on March 23, 2011.

10

In these circumstances, *Contec* holds that Plaintiff should be compelled to arbitrate the issue of arbitrability. *Contec*, 398 F.3d at 209. An arbitrator should decide whether the 2010 Written Agreement continued to remain valid, and, by extension, whether the present dispute is arbitrable pursuant to that agreement.

## IV.   NON-SIGNATORY SG ENERGY MAY ENFORCE THE ARBITRATION AGREEMENT AGAINST PLAINTIFF

In the alternative, even if *Contec* did not require the parties to arbitrate the question of the 2010 Written Agreement's continued existence, Plaintiff would still be barred from bringing this action pursuant to the doctrine of equitable estoppel.

### a.   The Equitable Estoppel Test

In a dispute over application of an arbitration clause, "ordinary principles of contract law apply," as well as "a number of common law principles of contract law that may allow non-signatories to enforce an arbitration agreement . . . ." *Ross*, 478 F.3d at 99 (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995). One of the common law theories recognized by the Second Circuit for allowing a non-signatory to enforce an arbitration agreement is equitable estoppel, pursuant to which the signatory will be estopped from avoiding "arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the stopped party has signed." *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d Cir. 1999).

Courts in this district have applied a two-part test in "determining whether the signatory's claims are intertwined with the underlying contract obligations . . . . [analyzing] whether (1) the signatory's claims arise under the 'subject matter' of the underlying agreement, and (2) whether there is a 'close relationship' between the signatory and the non-signatory party." *Ragone v. Atl.*

11

*Video at Manhattan Ctr.*, 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008) (Koeltl, J.), *aff'd*, 595 F.3d 115 (2d Cir. 2010); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 402–03 (S.D.N.Y. 2003) (Pauley, J.); *Chase Mortg. Company-West v. Bankers Trust Co.*, 2001 WL 547224, at *2–3 (S.D.N.Y. May 23, 2001) (Mukasey, J.); *see also Ross*, 478 F.3d at 480–85.

   i.  Subject Matter of the Underlying Agreement

  The first question for the Court to consider when applying the equitable estoppel test is whether Lismore's claims arise from the "subject matter" of the agreement with the arbitration clause. *See, e.g., Ragone*, 2008 WL 4058480, at *8. For example, in *Ross*, the Second Circuit found that "[i]t is indisputable that the subject matter of the dispute between the parties . . . is related to the subject matter of the" agreement containing an arbitration clause where the plaintiffs sought to sue their credit card companies and the plaintiffs' card holder agreements called for arbitration in the event of any action brought by a cardholder. *Ross*, 547 F.3d at 146. Similarly, in *Ragone*, Judge Koeltl found that a plaintiff's workplace sexual harassment claims fell under the subject matter of the arbitration agreement where the agreement covered "any and all claims or controversies arising out of the employee's employment . . . ." *Ragone*, 2008 WL 4058480, at *8.

  In the present case, the 2010 Written Agreement requires arbitration of "all disputes arising out of or relating to this Agreement, your employment or the termination of your employment with SG . . . ." (Compl. Ex. C ¶ 11). Plaintiff alleges that "executives of Société Générale" discriminated against him as an American (Compl. ¶ 25). Plaintiff alleges that an SG executive acknowledged that Plaintiff "had performed his obligations" and that "what SG Energy and Société Générale had done to [Plaintiff] was unfair." (Compl. ¶ 39). Plaintiff further asserts

that he was promised he would be paid a bonus package from a fund created by Société Générale

"for *Société Générale employees* involved in the origination and integration of SG Energy,

including Plaintiff." (Compl. ¶ 40). These allegations all arise out of and relate to Plaintiff's

employment with SG. The subject matter of the agreement and the subject matter of this dispute

are intertwined.

ii.    "Close Relationship"

The second prong of the equitable estoppel test looks at whether there exists a sufficiently

"close relationship" between the signatory and the non-signatory who seeks to compel

arbitration. *See, e.g., Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir.

2008); *Ragone*, 595 F.3d at 127–28.

The Second Circuit has had "no occasion to specify the minimum quantum of

'intertwined-ness' required to support a finding of estoppel." *Ross*, 547 F.3d at 144. "The

estoppel inquiry is fact-specific," *id.*, and "there must be a relationship among the parties of a

nature that justifies a conclusion that the party which agreed to arbitrate with another entity

should be estopped from denying an obligation to arbitrate a similar dispute with the adversary

which is not a party to the arbitration agreement." *Sokol Holdings, Inc.*, 542 F.3d at 359. That is

to say that in order for estoppel to apply, there "must be a relationship among the parties which

either supports the conclusion that [the signatory] had consented to extend its agreement to the

[non-signatory], or, otherwise put, made it inequitable for [the signatory] to refuse to arbitrate on

the ground that it had made no agreement with [the non-signatory]." *Id.* at 361; *see also Ragone*,

595 F.3d at 128 (equitable estoppel appropriate where the signatory knew at the start of her

employment that she would work with and be supervised by the non-signatory entity).

The 2010 Written Agreement implicitly contemplates Plaintiff accepting positions with affiliates of SG either within the scope of or in conjunction with that agreement. (Compl. Ex. C ¶ 4; *see also* Section III.b *supra*). Thus, at the time that Plaintiff entered into the agreement with the arbitration clause, he knew that his employment with SG could entail his assuming positions at affiliates of SG. Under these circumstances, it would not be equitable to allow Plaintiff to avoid his obligation to arbitrate his employment dispute in a claim filed solely against SG Energy, such an affiliate. *See, e.g.*, *Sokol Holdings, Inc.*, 542 F.3d at 359–62; *Ragone*, 595 F.3d at 128.

Plaintiff argues that there are no cases where a grandparent subsidiary (as opposed to a direct subsidiary) has been found to have a close enough relationship with a subsidiary to warrant application of this doctrine. (Opp. Br. at 10–11). Yet this observation misses the point of the applicable test. The question is whether Plaintiff, at the time that he entered into the 2010 written employment agreement, reasonably understood that it could involve working with an affiliate of SG and that such work could therefore fall within the scope of the arbitration clause. *See, e.g.*, *Sokol Holdings, Inc.*, 542 F.3d at 359–62; *Ragone*, 595 F.3d at 128. The 2010 Written Agreement indicates that he did.

Furthermore, the Complaint alleges that SG "controlled the affairs of SG Energy." (Comp. ¶ 30). Plaintiff alleges that it was SG's executives who discriminated against him as an American, and SG's executives who made the decision not to grant Plaintiff the title that he believed he would inherit. (Comp. ¶¶ 25–29). When Plaintiff resigned, he went through SG's HR Department. (Ex. B). Accordingly, it appears from the allegations in the Complaint that SG Energy was completely controlled and dominated by SG, and Plaintiff understood so much at the time of the alleged oral agreements. In these circumstances "[t]he parties to the . . . contract

14

certainly understood that [the signatory] controlled [the non-signatory entity]" and estoppel is therefore appropriate. *Charity Folks, Inc. v. Kim*, 757 F. Supp. 2d 378, 380 (S.D.N.Y. 2010) (Kaplan, J.).

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss and Compel Arbitration is GRANTED.[3]  The Clerk of Court is instructed to close this case.

SO ORDERED.

Dated: August 1⁊, 2012
      New York, New York

                         ALISON J. NATHAN
                      United States District Judge

---

[3] Where a plaintiff's claims are arbitrable, the ordinary remedy contemplated by the FAA is a stay. *See* 9 U.S.C. § 3. However, when all of the issues raised in a complaint are subject to arbitration, dismissal is appropriate. *Ramasamy v. Essar Global Ltd.*, 825 F. Supp. 2d 466, 471 (S.D.N.Y. 2011) (Rakoff, J.).